UNITED STATES of America,
Plaintiff,

v.

CITY OF CHARLESTON et al.,
Defendant.

Civ. A. No. 1775.

United States District Court
S. D. West Virginia.

March 20, 1957.

Percy H. Brown, Asst. U. S. Atty., Hinton, W. Va. (Duncan W. Daugherty, U. S. Atty., Huntington, W. Va., on the brief).

Donald O. Blagg and A. G. Stone, Charleston, W. Va., for Sanitary Bd. of City of Charleston (Elmer H. Dodson, City Solicitor of City of Charleston, on the brief).

MOORE, Chief Judge.

In this case the United States seeks to recover from the City of Charleston the amount of three advances of money made to the City by the Federal Works Agency for the purpose of plan preparation for construction of a proposed sewage treatment and disposal system. Both parties have moved for summary judgment. The Sanitary Board of the City of Charleston composed of John T. Copenhaver, Chairman, Harry P. Musser, Sr., Vice-Chairman, and Dr. H. H. Smallridge, Member, have been brought into this case by amendment to the original pleadings. No substantial dispute of fact is presented.

The Congress of the United States in the year 1944 enacted a statute known as the War Mobilization and Reconversion Act of 1944, 58 Stat. 785. It was provided in Title V, Sec. 501 of the Act that, in order to encourage nonfederal public agencies to make advance provision for the construction of public works, the Federal Works Administrator was authorized to make loans or advances to such public agencies to defray the costs of preliminary engineering work. It was further provided that advances made should be repaid "if and when the con-

struction of the public works so planned is undertaken." The regulations adopted by the Administrator for giving effect to the Act contained the following provision:

"Section 12. Repayment of Advances.—Each advance shall be repaid in full without interest by the applicant when the construction of the public work for which the advance is made is undertaken or started. The construction shall be considered as undertaken or started when the first construction contract is awarded or the applicant begins construction with its own forces."

On May 29, 1945, the City of Charleston, by D. Boone Dawson, then Mayor, made written application to the Federal Works Agency for an advance of $45,-245. On June 6, 1946, a like written application was made for an advance of $50,720; and on the same date a further written application was made for an advance of $27,760. The printed application form in each case contained the following direction to the applicant: "Indicate the contemplated sources of funds and the amount from each source:". Various sources were listed in the printed words of the form, including "Available cash," "Tax receipts," "General obligation bonds authorized," "General obligation bonds to be authorized," "Revenue bonds authorized," and "Revenue bonds to be authorized." These were followed by a space for the insertion by the applicant of "Other sources."

In the first application were listed the sum of $1,136,849 in the space allocated to "Revenue bonds to be authorized," and the sum of $300,000 in the space reserved for "Other sources," in which space was written in by typewriter the statement, "Footage assessments."

In the second application was listed the sum of $1,384,420 in the space allocated to "Revenue bonds to be authorized." No other source was indicated. In the third application were listed the sum of $585,200 in the space allocated to "Revenue bonds to be authorized," and in the space allocated to "Other sources,"

the sum of $174,910, the applicant having designated this item by typewriting as "Footage assessments."

These advances were made by the Federal Works Agency, in the respective amounts of $45,245, $50,700, and $27,-750. Agreements covering the advances were entered into by representatives of the City of Charleston and the Federal Works Agency. The Council of the City of Charleston, on March 18, 1946, authorized its then Mayor, D. Boone Dawson, and its then Clerk, H. C. Walker, to sign the first agreement, which they did on March 20, 1946; and it was accepted on behalf of the United States of America on April 3, 1946, by the Division Engineer of the Federal Works Agency. On February 3, 1947, the Council authorized its then Mayor, D. Boone Dawson and its then Clerk, Guy M. Massey, to sign the second of the agreements on behalf of the City, which was done on February 5, 1947. The date of purported acceptance by the United States was inserted as February 13, 1947, and the title "Acting Division Engineer" was stamped on the agreement, but no actual signature of the Acting Division Engineer appears on the copy exhibited in evidence. The same is true with reference to the execution of the third agreement.

All three agreements were identical in form. The public work was described in the first agreement as "sewer facilities—sewage treatment plant;" in the second as "additions to an existing sewage system, including pumping stations and river crossings;" and in the third as "additions to an existing sewage system." All the advances were described in the printed form as being "for the purpose of plan preparation for the construction of" the described public work. The City of Charleston in each case, and this provision was also set out in the printed form, "contingent upon receipt of the advance, offers to complete such plan preparation and to repay such advance when required, in accordance with the regulations of the Bureau dated January 1, 1946." The pertinent regulations are section 12 as above quoted, together

with section 3(d), which provides as follows:

"An advance shall not be required to be repaid until the construction of the public work for which the advance is made is undertaken or started, as provided in section 12 hereof. Until such construction is undertaken or started the advance shall not be deemed by the United States to be a debt or obligation within the meaning of any constitutional or statutory limitation."

The total amount of the advances was $123,695. The money was all expended by the City of Charleston in the years 1946 to 1949 for the several purposes for which the advancements were made. None of the money has been repaid.

The Constitution of the State of West Virginia contains the following limitations on the power of a municipal corporation to incur debt:

"No county, city, school district, or municipal corporation, * * * shall hereafter be allowed to become indebted, in any manner, or for any purpose, to an amount, including existing indebtedness" (above a certain limitation); "nor without, at the same time, providing for the collection of a direct annual tax, sufficient to pay, annually, the interest on such debt, and the principal thereof, within, and not exceeding thirty-four years; Provided, That no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a vote of the people, and have received three-fifths of all the votes cast for and against the same." W.Va.Const., Article 10, Sec. 8.

The statutory limitation in West Virginia on the power of a city to incur obligations is as follows:

"A local fiscal body shall not expend money or incur obligations:

"(1) In an unauthorized manner;

"(2) For an unauthorized purpose;

"(3) In excess of the amount allocated to the fund in the levy order;

"(4) In excess of the funds available for current expenses." Code of West Virginia, Chapter 11, Article 8, Section 26. (Michie 1943.)

It is stipulated in this case that no provision for repayment has ever been made in the levy orders, and that no funds have been available at any time for the purpose of repaying the advances (except such if any as may have been provided by the proceeds of revenue bonds). The question of incurring the obligations, or repaying the advances made by the Federal Works Administrator has never been submitted to a vote of the people.

In the year 1933 an act was passed by the Legislature of West Virginia whereby municipal corporations were authorized to construct sewage collection systems and sewage treatment plants, and to issue revenue bonds to pay the cost thereof. The portions of this act which are applicable to the questions presented in this case are now set forth:

"Any municipal corporation * * * is hereby authorized and empowered to own, acquire, construct, equip, operate and maintain * * * a sewage collection system and/or a sewage treatment plant or plants * * * and to issue revenue bonds to pay the cost of such works and property. No obligation shall be incurred by the municipal corporation * * * in such construction or acquisition except such as is payable solely from the funds provided under the authority of this article." Code of West Virginia, Chapter 16, Article 13, Section 15. (Michie 1943.)

"The cost of the works shall be deemed to include * * * engineering and legal expenses; expense for estimates of costs and of revenues; expenses for plans, specifications and surveys; other expenses necessary or incident to determining the feasibility or practicability of the enterprise, * * * and such other expenses as may be necessary or incident to the financing herein

authorized and the construction or acquisition of the works and the placing of the works in operation and the performance of the things herein required or permitted in connection with any thereof." (Id. sec. 22.)

The act from which the above sections are quoted further provides in one section for the appointment by the city council of a sanitary board to have "supervision and control of" "the custody, administration, operation and maintenance of such works." (Id. sec. 32). Another section of the act provides that "the construction, acquisition, improvement, equipment, custody, operation, and maintenance of any such works" shall be under the supervision of the sanitary board. (Id. sec. 16). It is further provided in the act that "[A]ll necessary preliminary expenses actually incurred by the board of any municipality in the making of surveys, estimates of costs and of revenue, employment of engineers or other employees, the giving of notices, taking of options and all other expenses of whatsoever nature, necessary to be paid prior to the issue and delivery of the revenue bonds" may be met and paid either out of general funds of the municipality or by a transfer from other funds or by the council authorizing a "temporary loan in the same manner that other temporary loans are made by such municipality." (Id. sec. 18). Such advances to the board from the municipality itself are to be given priority of payment out of the proceeds of the sale of the revenue bonds, which are then to "be applied solely to the payment of the cost of the work." (Id. sec. 27).

The council created the sanitary board by ordinance in the year 1952. The board thereupon took up the sewage project in the stage which had then been reached in the preliminary engineering and planning work; caused further planning to be done; made substantial changes in the design of the plant because of its inability to acquire the particular property which had at first been thought available and because of the introduction of modern methods which were not in use when the original plans were made, and proceeded with the construction of the sewage system, which is now in an intermediate stage of completion.

Revenue bonds have already been issued and sold in the face amount of $5,-500,000. A sinking fund has been provided to pay the principal and interest. At this time current annual revenues from service charges made by the sanitary board have produced sufficient funds to meet all sinking fund requirements and to allow a future additional $1,000,-000 of revenue bonds to be issued without any increase in rates charged to users. However, the total cost of the sewage treatment and disposal system is estimated at approximately $12,000,-000. It was testified by the manager of the sanitary board that before any bonds in excess of $6,500,000 may be issued and marketed, it will be necessary to increase the rates heretofore fixed by the sanitary board, and that such increase or increases will be subject to approval by the Public Service Commission of West Virginia.

The 1933 Act provides the following procedure as preliminary to the issuance of revenue bonds.

"Before any municipality shall construct or acquire any works under this article, the governing body shall upon petition of the board, enact an ordinance or ordinances which shall: (a) Set forth a brief and general description of the works and, if the same are to be constructed, a reference to the preliminary report which shall heretofore have been prepared and filed by an engineer chosen by the board as aforesaid; (b) set forth the cost thereof estimated by the engineer chosen as aforesaid; (c) order the construction or acquisition of such works; (d) direct that revenue bonds of the municipality shall be issued pursuant to this article in such an amount as may be found necessary to pay the cost of the works; and (e) contain

such other provisions as may be necessary in the premises." W.Va.Code, c. 16, art. 13, § 19 (Michie 1943).

It is further provided in the 1933 Act that a trustee be appointed to receive, hold, and pay out the funds derived from the proceeds of revenue bonds. Pursuant to this provision the Kanawha Valley Bank of Charleston, West Virginia, was designated as trustee and an agreement was executed between the sanitary board and the trustee, dated December 15, 1952, which stipulated that payments for the cost of the works should be made by the trustee only upon requisition by the sanitary board signed by the chairman or vice-chairman, and the secretary or treasurer thereof; accompanied in some cases by a certificate of the consulting engineer, and in other cases by certified copies of minutes of the sanitary board.

██ It has long been established as the law in West Virginia that obligations incurred by a city under the authority of the 1933 Act hereinabove quoted from, permitting the issuance of revenue bonds for the construction of sewers, are not to be deemed "debts" within the constitutional inhibition. In the case of Brewer v. City of Point Pleasant, 114 W.Va. 572, 172 S.E. 717, 720, Judge Hatcher of the Supreme Court of Appeals of West Virginia, after pointing out that the act requires that "the bonds shall contain a statement on their face that the municipality shall not be obligated to pay the same or the interest thereon except from the special fund provided from the net revenues of the work" and that by other provisions of the act the rights of bondholders are limited in case of default to the collection and application of rates chargeable to patrons of the works, continues as follows:

"The provisions of the Act become a part of the contract between the municipality and the bondholders as effectually as if written verbatim in the bonds. The bondholders are bound by their contract in this instance just as firmly as in any other legal contract. Consequently, we must hold that the bonds do not create a corporate indebtedness of the municipality."

██ It seems clear from those portions of the 1933 Act hereinabove quoted that a municipality in West Virginia is authorized to incur obligations for the purpose of defraying preliminary expenses of sewer projects, provided repayment of such obligations is to be made solely from the proceeds of revenue bonds, and not in any way from tax levies. It is foreseen, as shown in Section 22 of the Act, that a city may probably incur expenses in "determining the feasibility or practicability of the enterprise." Such determination would of course be made prior to the issuance of any revenue bonds, and probably before the creation of a sanitary board. It might often result in a rejection of the project altogether, in which event no revenue bonds would be issued, and any obligation incurred by the city might prove to be uncollectible. On the other hand, if the project be undertaken by the city, whatever loans may have been made on the faith of the revenue bonds as authorized by this portion of the act would or should be included in the cost of the works and repaid out of the proceeds of the bonds.

██ This is the very situation which confronts us in the case at hand. It is quite clear from the War Mobilization and Reconversion Act of 1944 itself, the regulations of the Federal Works Administrator, the applications for the several advances and the agreement between the City of Charleston and the Federal Works Administrator, that the city incurred the obligation, upon signing the agreements, to repay the advances if and when construction of the sewage treatment plant should be started. If construction were not undertaken, there was no obligation to repay the advances. The application in each case shows that the only prospective source of funds, other than some relatively small footage charges, is to be the proceeds of the revenue bonds. Even if this condition had not been pointed out in the applications, the

limitations imposed by the 1933 Act would be read into the agreement, since the parties are presumed to know the extent of the city's authority to make a binding contract in this respect.

■ The city, in resisting payment of the advances, points not only to the constitutional limitation on the power of a city to incur debt but also to the statutory limitation. The latter has to do with the taxing power of the city. Its purpose is to protect the taxpayers from acts of the city whereby but for the statute funds raised by taxation might be improperly used, or the taxes to be collected in future years might be pledged for the payment of current expenses. This statutory limitation upon the use of money derived from tax levies is inapplicable in any case where the funds are derived not from taxes but from service charges made to persons who use the service. Revenue bonds constitute no liability whatsoever upon the taxpayers as such. Many persons may be users of the service who are not taxpayers, and many taxpayers may not use the service. There is no limitation upon the city's power to fix reasonable charges for sewer service (other than the asserted necessity of obtaining approval of rates by the Public Service Commission). In view of these considerations it can not be said that there is any conflict between the Act of 1933, authorizing the city to incur expenses which are to be payable solely from the proceeds of revenue bonds, and the general statutory limitations on the expenditure of money and incurring of obligations with respect to funds produced by tax levies.

■ It was argued by counsel for the city at the hearing that any money used in preliminary engineering work prior to actually beginning construction of a sewage disposal system must be handled by the sanitary board in accordance with the provisions of sections 16, 18, and 32 of the 1933 Act above referred to. I do not so interpret the act. The sanitary board is an agency of the city. The act merely requires that the construction and maintenance of the project be under the supervision and control of the sanitary board. A method is provided whereby the sanitary board may meet its own necessary preliminary expenses; but the city, in the early stages of the project, during that period in which the city has not even decided to go ahead with the work, and when there is no sanitary board in existence, is not prevented by any provision in the act from obtaining such advances as those in question here by any procedure which it may see fit to adopt.

In 1949, and therefore subsequently to the date of the agreements in suit, the Legislature of West Virginia passed an amendment to the 1933 Act, whereby municipalities were expressly authorized to accept from the Federal Government loans or grants and to enter into agreements for the repayment of such loans or grants out of the proceeds of revenue bonds. Another provision of the amendment excluded from the cost of the works payable from the proceeds of revenue bonds any portion of the cost that might "be defrayed out of any grant or contribution." This exclusionary clause, although apparently in conflict with the other portion of the amendment which has been mentioned, need not concern us here, since, in the first place, it was enacted subsequently to the respective dates of the agreements, and secondly, I have concluded that the advance made to the city by the Federal Agency was not a grant or contribution, but a loan. Neither is it significant that the Legislature saw fit to make clear the authority of the city to accept federal loans, inasmuch as such authority was incidental to the general powers granted the city by the 1933 Act, as has been pointed out.

Counsel for the city at the hearing, after stating that all proceeds heretofore realized from the sale of revenue bonds had been already used, urged that the United States should not be repaid out of the proceeds of future bond issues, because, as he contended, such payment would impair the security of the bondholders. The facts do not support this contention. The security upon which the

bondholders are entitled to rely consists of the sinking fund provided for in connection with each issue of bonds, together with any surplus which may exist in the funds provided by the collection of service charges from users of the sewer after the payment of operational and maintenance expenses. True, the ordinance of the city pursuant to which the bonds were issued provides that temporary advances may be made from the proceeds of revenue bonds to the sinking fund whenever collections from users are insufficient to pay maturing interest on the bonds; but it is clear from the evidence of the manager of the sanitary board that no such advances have been needed or will be needed. In fact, there is a surplus in the fund sufficient to provide the basis for a pending petition to the council, as has been pointed out, for the issuance of an additional $1,000,000 of revenue bonds without any increase in rates charged to users of the sewer system.

█ Moreover, it should be borne in mind that these advances from the United States to the city represent a part of the cost of the works which should have been repaid out of the first proceeds received from the sale of the first issue of revenue bonds. Such repayment does not in any way increase the cost of the works; it was the very first item of expense incurred in connection with the works. It has been a liability, according to the very terms of the agreements, from the moment construction of the sewage treatment and disposal plant began, under the supervision of the sanitary board. No disadvantage results to the bondholders as a result of the payment of this just debt out of the proceeds of the revenue bonds.

Counsel for the United States contends forcefully that even if the agreement by the city to repay the advances were not within the city's constitutional and statutory power, nevertheless judgment should be entered against the city on the theory of unjust enrichment, or upon general equitable principles. I find it unnecessary to explore this theory of re-covery, in view of the conclusions already announced.

█ Obviously, it would not be proper in this case to award a general judgment to the United States against the City of Charleston for the amount of money due under the agreements. To do so would be to give to the United States the right to levy upon city property, W. Va.Code, c. 38, art. 4, §§ 5, 6 (Michie 1955), or failing in this, to compel the city by appropriate process to levy a tax for the payment of the judgment, see W. Va.Code, c. 53, art. 1, § 1 (Michie 1955). The constitutional prohibition stands squarely in the way of any relief which would throw the burden of this obligation on the taxpayers.

The United States is entitled, however, in this proceeding to an order requiring the sanitary board of the City of Charleston to issue a requisition to the trustee into whose hands the proceeds of the revenue bonds come, to repay out of any funds in its hands comprising proceeds of revenue bonds issued for the sewage treatment and disposal project here in question, the face amount of the three advances made, together with interest as hereinafter allowed; and if there are no such funds or if there are insufficient funds of this description in the hands of the trustee, to require the sanitary board to include in the cost of the work covered by any pending or next future petition to the city council as the basis for the issuance of future revenue bonds, and when such bonds shall have been sold, to issue a like requisition to the trustee to repay to the United States out of the proceeds thereof, such part or all of such advances as may not have been repaid out of funds in hand.

On June 28, 1954, the United States demanded payment of $78,450 on or before July 28, 1954. On November 4, 1954, it demanded payment of $45,245 on or before December 6, 1954. These sums represent the face amount of the three advances made. Since the amounts are liquidated, no reason is perceived why the United States is not entitled to interest on the respective amounts from the re-

spective dates when payments were demanded to be made; namely, interest on $78,450 from July 28, 1954, until paid; and interest on $45,245 from December 6, 1954, until paid. The regulations themselves provide that no interest is to be charged on the advances; but when the advances are not repaid according to the agreement, and demand for repayment is refused by the city, this waiver of interest ceases to be applicable from that time forth.

I am of opinion that in view of all the circumstances of this case 4% is a reasonable rate of interest to be allowed as aforesaid.

Permission is given to file whatever amendments to the pleadings may be necessary or proper in order to conform the pleadings to the relief awarded.